Oscar Bellomy, Appellee, v. Albert H. Bruce, Trading as Consolidated Oil Company, and Paul Conover, Appellants.

Gen. No. 9,191.

Heard in this court at the April term, 1939. Opinion filed October 19, 1939. Rehearing denied February 27, 1940.

LANCASTER & NICHOLS, of Quincy, and POPE & DRIEMEYER, of East St. Louis, for appellants.

WILSON & SCHMIEDESKAMP, of Quincy, for appellee.

Mr. Justice Hayes delivered the opinion of the court.

This is an appeal by defendants-appellants (hereinafter called defendants) from a judgment in favor of plaintiff-appellee (hereinafter called plaintiff) for $20,000 for personal injuries.

The case was tried upon the issues made by an amended complaint, consisting of two counts. The first count charged the defendants with negligently and carelessly unloading gasoline from a truck in the presence of a lighted lantern. An explosion and fire resulted therefrom, whereby the plaintiff was burned and permanently disabled. Plaintiff further avers that he was present during the unloading of the gasoline and was all of the time in the exercise of due care for his own safety. Count two charges the defendants with wantonly unloading the gasoline from a tank truck inside of a building on a hot night, and while a lighted lantern was burning in said building, and that an explosion and fire did result.

The answer admitted the allegations of the complaint except that it denied that plaintiff exercised due care; denied the charges of negligence and of wanton conduct; avers that plaintiff actively participated in unloading the gasoline, and charges that any injury received by the plaintiff was the direct and proximate result of his own carelessness and negligence. The plaintiff replied denying the allegations of negligence on his part as set out in defendant's answer.

Plaintiff was the operator of a filling station in Coatsburg, which he leased from the defendant Bruce. Bruce was a wholesale gasoline dealer in Quincy. Plaintiff purchased gasoline from Bruce which Bruce delivered to his filling station in Coatsburg in an automobile tank truck. For some time prior to July 14, 1938,—the date of the explosion in question,—the plaintiff had an arrangement with Bruce whereby Bruce's truck was, at plaintiff's request, to be used for de-

liveries of gasoline plaintiff had to make in the country. On each occasion when there was a country delivery to be made, plaintiff or his boy would go with the driver of the truck and assist in emptying the contents of the truck tank into the farm tank.

About noon on July 14, 1938, plaintiff ordered a load of gasoline from Bruce. Bruce's truck arrived at plaintiff's filling station about 7:00 or 7:30 p. m. with 585 gallons of anti-knock and 315 gallons of white gasoline. Defendant Conover was driving the truck. Plaintiff told Conover that 250 gallons of the white gasoline were for a farmer named Schoch who wanted it delivered that evening, and asked Conover to take it to Schoch's farm. The anti-knock gasoline was unloaded at plaintiff's station, and plaintiff gave Conover a check for the price of the entire load. None of the white gasoline was unloaded into plaintiff's tanks as it was the intention of both of them to bring back the gasoline that was not put into the farmer's tank, and to dump it into plaintiff's tank at his filling station, after the delivery to Schoch had been completed.

Plaintiff got into the truck with Conover and two Niehoff boys, one of whom was then in the employ of Bruce, and they went to the Schoch farm about seven miles distant. Plaintiff directed the way they traveled. Plaintiff, at one time, lived near Schoch's farm and was acquainted with it and the buildings on it.

When plaintiff and Conover arrived at Schoch's farm, it was after dark,—about eight o'clock or a little after,—and plaintiff saw Schoch walking between the house and the machine shed with an open-flame lantern, an oil burning lamp. He saw Schoch open the door to the machine shed, go inside, and noticed that he had the lighted lantern in his hand when he went into the shed. Schoch's son drove a car out of the machine shed, and Conover backed the truck into the shed through the door from which the car had been driven, while plaintiff stood to one side of the truck,

outside the shed, directing him. Plaintiff then went inside the shed on the left side of the truck.

The machine shed was approximately 30 feet long, north and south. Its width east and west is not stated in the record, but it appears that it had two doors on the south side. The truck was backed through the east door. The rear end of the truck projected one and a half to two feet into the shed. The 250 gallon tank, which was to be filled with gasoline, stood slightly to the north of the rear end of the truck and about six feet west of it. The top of this tank was four and a half or five feet off the ground. There was a cultivator and other farm machinery along the west and north walls of the shed. There was a door on the east side of the shed at the north end.

After Schoch opened the door into the shed, he went inside the shed and moved different articles off the gasoline barrel, with his lantern on his arm. He had not finished moving things out of the way before the truck backed in. They began unloading the gasoline just before he was through moving things around. Defendant Conover drew the gasoline from the tank truck by drawing it into five gallon pails which he then handed to the plaintiff, and plaintiff emptied the gasoline into a hole in the top of Schoch's tank through a funnel. Conover drew gasoline from the tank truck into five gallon pails by means of a faucet at the back end of the truck. The evidence shows that five gallons of gasoline weigh about 35 pounds and that with the can, the weight would be about 45 pounds. Conover testified that he knew plaintiff was busy pouring the gasoline into the tank; that plaintiff was pouring this gasoline as high as his head or a little over, and that plaintiff was facing the west and south.

Plaintiff testified that after approximately 10 gallons of gasoline had been drawn, he told Schoch to take the lantern out and that Schoch started back towards the door in the northeast corner of the building. Plain-

tiff knew there was a door there as he had often used it, and from the time Schoch started back to the door with the lantern plaintiff did not see the lantern again or know it was in the shed. Conover testified that he heard plaintiff say something that night about taking the lantern out of the place; that he also said the same thing as plaintiff did about taking the lantern out and that he intended it for Mr. Schoch. Schoch testified that he did not hear either the plaintiff or Conover say anything about taking the lantern out, but that he (Schoch) just made the remark, "I better carry that lantern out." Schoch did not carry the lantern out, but took it back and set it down about one and a half feet from the east wall of the shed by the north door, and about 20 feet from the point where the gasoline was being poured into the farm tank.

The lights in the shed consisted of a flashlight, which one of the boys held while plaintiff was emptying the cans through the funnel into the tank; another flashlight which Conover held in his hand; the three red lights on top of the tank truck which are in a row on the back end, and the tail light on the truck. Schoch testified that when he started back with the lantern, there had been no explosion or fire,—"ten gallons of gas were drawn at that time. I went back and set the lantern down and did not move it after that time. There was an explosion and fire later that evening. After I set the lantern down I talked to my neighbor, Walter Weller, at the northeast door. I just turned around and started to walk back to the truck with the flashlight in my hand; after that I did not hear Mr. Conover say anything about a lantern. After I set the lantern down at the door I think about twenty gallons of gas was drawn before the fire or explosion."

Conover testified that he could drawn gasoline faster than Bellomy could pour. When Conover turned to hand the cans of gasoline to Bellomy, Conover turned his face to the west and then around to the north.

Conover testified, "nobody had it (lantern) when I seen it. I saw it sitting back at the door at the north end of the building at the east wall on the ground, that was the first I saw of the lantern. Bellomy was facing with his face towards the west and south. When I saw the lantern it was about northeast from Bellomy. His back was just towards the lantern as he was pouring. After I saw that lantern there on the ground, I drew about four gallons of gasoline into the can. When I saw the lantern on the ground I did not say anything to anybody to take it out. I had said the lantern should be taken out. I realized it was dangerous to be sitting where it was, and it should be taken out immediately and that leaving it there too long might cause an explosion. I continued to draw four gallons of gasoline. Up to the time I was drawing the four gallons of gasoline there had been no explosion and after I had drawn the four gallons of gasoline there was an explosion."

As a result of the explosion, plaintiff was terrifically burned. The evidence shows that most of his clothing was burned off his body and that he has not been able to wear clothing from the time of the fire up to the date of the trial. The most severe burns were on the right leg and left arm. The evidence disclosed that he had suffered a great amount of pain; that he had incurred first, second and third degree burns; that he was severely burned over a great part of his body; that there were blisters and pieces of skin hanging from his arms and other portions of his body, and for several days following the injury he was close to death. At the time of the trial the burns were healing, but there was a great deal of scar tissue and atrophy. It was necessary to do some skin grafting on the left arm, but plaintiff's condition prohibited doing this for two or three months. There was permanent injury to the left arm and right leg. The medical services rendered up to the time of the trial amounted to $500, and the hospital bill, for the same period, was $768.85.

A stipulation was entered in the trial court between plaintiff and defendants stating that injuries received by the plaintiff were the direct and proximate result of an explosion and fire, caused by gasoline vapor, which was incident to the unloading of gasoline coming in contact with a lighted lantern located in the machine shed.

Both defendants were called by the plaintiff for cross-examination under section 60 of the Practice Act [Ill. Rev. Stat. 1937, ch. 110, § 184; Jones Ill. Stats. Ann. 104.060]. The defendants offered no further evidence but at the close of plaintiff's case moved for a directed verdict which the court denied. The jury returned a general verdict finding the defendants guilty and assessing plaintiff's damages at $20,000. They also answered four special interrogatories submitted at defendant's request as follows: (1) plaintiff was not guilty of negligence which directly contributed to the cause of his injuries; (2) the defendant Conover was guilty of negligence, and (3) that the defendant Conover was guilty of wanton conduct in unloading the gasoline under the facts and circumstances shown in the evidence. The fourth interrogatory submitted was as follows: Were plaintiff and defendant Paul Conover both guilty of wanton conduct in unloading the gasoline under the facts and circumstances shown in the evidence? The answer was "no."

Defendants contend herein, with great emphasis, that the trial court erred in denying their motion for a directed verdict, and insist that plaintiff was guilty of the same degree of misconduct of which the defendant Conover was guilty, and for that reason he cannot recover in this action. They further state that contributory negligence is a defense to an action for negligence, and wilful and wanton conduct on the part of the plaintiff is a good defense, where plaintiff charges defendant with wilful and wanton misconduct. This is the most important and vital factor in this case and is worthy of great consideration and calm deliberate

judgment. It is a matter of common knowledge that an open light should not be allowed where gasoline is being used or exposed to air, for the vapor of gasoline when mixed with the proper proportion of oxygen in the air, particularly with high temperatures, becomes very inflammable, and when exposed to an open flame, explodes. Both the plaintiff and the defendant Conover were cognizant of this fact as both were experienced in handling gasoline.

A dangerous instrument was being handled here, and the degree of care exercised by those handling it should have been commensurate with the danger. Whether an act is wanton and wilful depends upon the circumstances of the case, and whether a personal injury has been inflicted wilfully or wantonly is a question of fact to be determined by the jury, if there is evidence to support the allegation. The rule is, in passing upon a motion to direct a verdict, if, when all the evidence is considered with all reasonable inferences drawn from it in its aspect most favorable to the party against whom the motion is directed, and if there is evidence to support all the necessary elements of the case, the motion should be denied. Ill-will is not a necessary element of a wanton act. To constitute an act wanton, the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and conditions, that his conduct will naturally and probably result in injury. An intentional disregard of a known duty necessary to the safety of the person or property of another, and an entire absence of care for the life, person or property of others such as exhibits a conscious indifference to consequences, makes a case of constructive or legal wilfulness. *Streeter v. Humrichouse*, 357 Ill. 234, 238.

The evidence in this case on the question of wilfulness and wantonness of the defendant Conover is such

that the trial court was warranted in submitting this issue to the jury. The evidence shows that after Conover had heard the plaintiff direct that the lighted lantern be taken out of the shed, which direction was not followed, that Conover saw the lantern in the northeast corner on the floor inside the shed; and as Conover carried each pail of gasoline from the faucet on the truck to the plaintiff, he faced the lantern and couldn't help but have knowledge of the presence of the lantern inside the shed. At that time the only light at the north end of the shed was the lantern. During this interval, Conover knew that plaintiff was standing with his back to the lantern and not in a position to see the lantern. The plaintiff was facing southwest and pouring the gasoline into the funnel in the tank at an elevation above his head, and it was difficult for him to keep up with Conover in disposing of the gasoline as fast as it was brought to him. The plaintiff, at this time, was facing a flashlight being held by one of the boys so he could see to pour into the funnel. Plaintiff's work was such that he stayed in one position and his constant attention was focused on pouring the gasoline through the funnel. Despite Conover's knowledge of the presence of the lantern in the building, he neither advised plaintiff of this fact nor did he stop drawing the gasoline from the tank, but under his own admission he drew four gallons of gasoline between the time he had seen the lantern in the building and the explosion, which shows an intentional disregard on the part of Conover of a known duty, and an entire absence of care for the life of others, such as exhibits a conscious indifference to consequences and makes a case of constructive or legal wilfulness.

We next come to defendants' contention that the wilful or wanton conduct on the part of the plaintiff is a good defense, where plaintiff charges defendant with wilful and wanton misconduct, and that both the plaintiff and Conover were equally negligent. On a casual

reading of the testimony, an impression is made that they were both in the same category, but on close, careful examination of the evidence it appears that plaintiff did direct that the lantern be taken out of the building; that Schoch, who had the lantern, started with it to the northeast door,—the presence of which plaintiff had previous knowledge,—and plaintiff assumed that the lantern was taken out of the building; that up to the time of the explosion and injury he had no notice of the presence of the lantern in the building and was not in a position to see it; that he was occupied in the difficult task of emptying the buckets into the tank which took his entire attention, and although he may have been guilty of contributory negligence, the facts and circumstances surrounding him and his opportunity to ascertain the presence of the lantern being just inside the door rather than outside is quite different from that of Conover. Under the facts and circumstances which surround each of these two men we cannot say, as a matter of law, that they are both equally guilty of wanton conduct but are forced to hold that the trial court was warranted in submitting this question of fact to the jury and properly denying the motion to direct a verdict.

Defendants assign error on plaintiff's given instruction and complain that in various instructions given for the plaintiff, the jury was referred to the amended complaint for a statement of the issues and although this form of instruction has been repeatedly condemned by the Supreme and Appellate Courts of this State, the defendants cannot complain, for their instructions were subject to the same criticism. In *Lerette v. Director General of Railroads,* 306 Ill. 348, the court said,

"It is contended that the court erred in giving certain instructions at the request of appellee which referred the jury to the declaration to determine the issues. This form of instruction has been repeatedly

condemned by this court. . . . But appellant is in no position to urge the question in this case, for the reason that the same error is found in many instructions given at the request of the defendants below.'' and in *Gourley v. Chicago & E. I. Ry. Co.,* 295 Ill. App. 160, the court said, ''We find, however, that defendant offered an instruction given by the court which is subject to substantially the same criticism, and the law is well settled 'that a party has no right to complain of an error in an instruction, when a like error appears in an instruction given at its own request.' ''

Criticism is made on instruction number 2, which stated that defendants have admitted in their answer that the defendant Paul Conover was at all times referred to in plaintiff's amended complaint as the servant and employee of the defendant, and that the plaintiff was not required to make any proof in that regard. The instruction carried the exact language of the admission in the answer and was properly given by the court.

Error is assigned on the giving of instruction number 9. Complaint is made that this is a peremptory direction of a verdict without any attempt to state the facts upon which the verdict should be predicated. We do not think the criticism is well founded, and the defendants did not object or except to this instruction in the trial court, so they are not now in a position to complain of it for the first time.

Defendants criticize instruction number 10. This instruction is in the usual form and has been approved by this court many times. Defendants put too narrow a construction on the word ''situation,'' which Webster defines as ''position as regards conditions and circumstances; state; condition.'' The word ''situated'' as used in this instruction referred to all the circumstances and conditions as shown by the evidence and included plaintiff's experience and knowledge in handling gasoline as shown by the evidence. Instruction number 12

given at the request of the defendants was as follows: "The Court instructs the jury that 'negligence,' as used in these instructions, mean the want of ordinary care, by ordinary care is meant such care as a man of ordinary prudence usually exercises under the same or similar circumstances." Plaintiff's instruction number 10 should be considered with defendants' instruction number 12, for the court gave a precautionary instruction which told the jury that the instructions given did constitute a series or whole and the jury should consider all of the instructions together in making up the verdict. Defendants complain of instructions number 24 and 25, because they did not require the jury to reach a determination on the issues solely from the evidence, since the words, "from the preponderance of evidence," were not repeated after the word "believe" in the latter part of the instructions.

Where there is a requirement in the first part of an instruction that the jury must base their findings upon the evidence, this applies and extends to all subsequent clauses in the instruction and need not be repeated in each succeeding clause. *Village of Altamont v. Carter,* 196 Ill. 286, 287.

Taken as a whole the set of instructions given contained a fair statement of the law applicable to the case in clear language that should have been readily understood by the jurors and the defendants were not prejudiced thereby.

Complaint is made by the defendants that the trial court permitted counsel for plaintiff to ask jurors whether they were financially interested, as stockholders or otherwise, in the Maryland Casualty Company, without requiring a showing by the plaintiff of any probable necessity for such question. A transcript of the examination of the jury is not included in the record, but on page 105 of the record it appears that one of the attorneys for the plaintiff stated in the record that plaintiff's attorney, at the close of the

examination of the first four jurors, asked the question of the jurors in regard to their financial interest as stockholders in the Maryland Casualty Company. He further stated that this same question came up in a case that was tried just prior to this one and the court held that such an inquiry was made in good faith; that this question was asked in good faith, and that his client be not prejudiced. He further stated that the Maryland Casualty Company was a stock company, and not a mutual company, and that they had filed a suit in the United States District Court to restrain the prosecution of this suit in the State court. The trial court accepted the attorney's word that the question was asked in good faith and stated there was no reason to believe to the contrary.

It was held in the case of *Smithers v. Henriquez,* 368 Ill. 588, 592, in substance: Where inquiry is made of jurors as to a possible financial interest in an insurance company, not a party to the suit, by questions propounded in good faith, with the object of eliminating interested parties from the jury, that such inquiry is not necessarily so prejudicial as to require a reversal.

Defendants complain that plaintiff was brought into the court room on a cot, and that this was very prejudicial. The trial court was careful to see that nothing unusual happened to excite sympathy throughout the trial. It does appear that the plaintiff was covered with a sheet except for his face and head, but the court stated in the record, that there were no burns or evidences of burns on his face or head. Defendants also state that the second motion for continuance should have been granted. The case was at issue, and the plaintiff was entitled to have his case tried. The granting of a continuance, except where it is based upon a statutory cause, rests in the sound judicial discretion of the court. *Benton v. Marr,* 364 Ill. 628.

Defendants assign error claiming the verdict was the result of prejudice, sympathy and other improper

causes and that it was excessive. They concede in their argument here, that plaintiff's injuries were severe, painful, and necessitated substantial expense for their treatment and care. The attending physician, who took care of the plaintiff from the time of the injury and up to the trial, describes in his testimony terrific injury to the body of the plaintiff, great pain and suffering covering a long period of time, as well as permanent injury to the right leg in that it could not be straightened. At the time of the trial, the physician stated that plaintiff's left arm was of no use and would require skin grafting. It is hard to visualize the human body suffering more pain than that described by the doctor, relative to plaintiff's injuries. This testimony stands unchallenged and uncontradicted, outside of the inferences drawn by counsel from the record. The defendants did not cross-examine plaintiff's doctor on the trial. The defendants had an examination of the plaintiff made by Doctor Reynolds shortly before the trial, but failed to call him at the trial or make any effort whatsoever to check the amount, extent or duration of plaintiff's injuries, and it is a reasonable deduction, under these circumstances, that the injuries were at least as bad as the attending physician described them.

The defendants having closed their case without offering any proofs on the extent of plaintiff's injuries are not now in a position to ask a court on review to do what they failed or feared to do at the trial. Although the verdict is large, in view of the state of the record, we do not feel warranted in setting aside the verdict of the jury and overruling the judgment of the trial court. For the reasons herein set forth the judgment of the circuit court of Adams county is affirmed.

*Judgment affirmed.*